# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    No. 10-20124-A/P |
| FELIX TYLER, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

_____

### REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Felix Tyler's Motion to Suppress Evidence, filed September 21, 2010. (D.E. 22.) The United States ("government") filed a response in opposition on October 22, 2010. Pursuant to the order of reference, the court conducted a suppression hearing on the motion. At the hearing, the court heard testimony from Memphis Police Department ("MPD") Officers Keith Crosby and Kittrel Robinson, and Agent David Perry of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The court also heard testimony from defense witness Lavelle Parker, whose testimony contradicted the testimony of the government's witnesses. The court admitted a transcript of Parker's testimony before the grand jury in this case (Ex. 1) and a certified copy of Parker's federal felony conviction for Possession of Stolen Mail (Ex. 2).

Based on the briefs filed in support of and in opposition to the motion, the evidence presented at the hearing, and the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied.

## I.  PROPOSED FINDINGS OF FACT

The court has carefully considered the testimony of all of the witnesses, including their demeanor as they testified at the hearing, and finds the government's witnesses to be credible and Parker to be not credible.  Therefore, the court adopts the officers' version of events as its Proposed Findings of Fact.

On December 17, 2009, ATF Agent David Perry utilized a confidential informant ("CI") in an attempt to purchase two ounces of crack cocaine from an individual known only as "Little Bones."[1] Agent Perry provided the CI with $2,300.00 in government funds to use to purchase the drugs.  At approximately 9:16 p.m., the CI met with Little Bones at a predetermined location.  Agent Perry conducted visual surveillance of the meeting, and the CI wore a hidden wire that allowed Agent Perry to monitor the CI's conversations with Little Bones.  After the CI gave Little Bones the buy money, Little Bones sent the CI into a grocery store to buy baking soda.  However, after the CI went into the store, Little

_____

[1]Agent Perry is an ATF agent who also is assigned to the Drug Enforcement Administration ("DEA") Task Force.

Bones drove off with the money and did not return. The CI then met with Agent Perry and reported that Little Bones had robbed him of the buy money at gunpoint. However, after Agent Perry questioned the CI further, the CI admitted that he had given Little Bones the buy money without first receiving the drugs, contrary to Agent Perry's instructions. The CI told Agent Perry that he initially lied about being robbed at gunpoint because he was afraid of getting in trouble with the agent.

Two days later, on December 19, Agent Perry received a call from the CI, who stated that he had located Little Bones. Later that same day, DEA Task Force Agent Thurman Richardson put the CI in contact with MPD Officers Keith Crosby and Kittrel Robinson in an effort to identify Little Bones. Agent Richardson informed Officer Crosby that Little Bones and the CI had been involved in an undercover drug deal and that Little Bones had stolen the buy money from the CI. The officers, along with an "Officer Campbell," drove the CI to the house where the CI stated Little Bones was located. The CI gave the officers a physical description of Little Bones and told them that Little Bones would be on crutches. As the officers drove by the house, they saw an individual on crutches wearing a cast on his foot and who matched the physical description given by the CI. The CI stated to the officers, "that's him."

The officers observed this individual (later identified as defendant Felix Tyler) approach a parked car driven by a woman

later identified as Lavelle Parker.  Tyler got into the front passenger's seat and the vehicle drove off, heading north on Third Street.  The officers closely followed the vehicle from behind, driving in the lane of traffic next to Parker's lane.  As the officers followed Parker's vehicle on Third Street, Parker changed lanes by turning into the officers' lane without using her turn signal.[2]  As she changed lanes, she nearly hit the police vehicle, causing Officer Crosby to apply his brakes and swerve to avoid a collision with Parker's vehicle, which in turn almost caused the police vehicle to collide with another car.  Based on this traffic violation, the officers activated their blue lights to initiate a traffic stop.

Officer Crosby got out of his vehicle and approached the driver's side of Parker's vehicle, while Officers Robinson and Campbell approached the passenger's side.  Officer Crosby told Parker that she nearly caused an accident and asked for her driver's license.  As he spoke with her, he noticed that Tyler had a fur coat over his lap and that Tyler's hand was under the coat.

_____

[2]There is a discrepancy between the testimony of Officer Crosby and Officer Robinson regarding whether the officers were in the lane to the left or right of Parker's lane.  Officer Crosby testified that they were in the traffic lane to the left of Parker's vehicle and that Parker turned into the left lane, whereas Officer Robinson testified that they were in the lane to the right of her vehicle and that she turned into the right lane.  (Tr. at 13, 40-41.)  However, both officers testified that Parker did not signal when she made the lane change and that Parker caused Officer Crosby to swerve in order to avoid a collision.

Officer Crosby observed what appeared to be a handgun protruding from Tyler's coat. Officer Robinson also observed the handgun and described what he saw as follows:

Q.   Okay. What did you see?

A.   Crosby was speaking with the female driver in regard to what happened, how she nearly caused an accident, and asked for her license. At which time she couldn't find it immediately so she had to ramble in her purse. I kept my eyes on the passenger because he had a fur coat that was partially on but not all the way on, and he kept looking towards Crosby like seeing where he was at. But he didn't notice that we were right there at the blindside. He kept reaching inside this coat and eventually getting the coat on down towards the floorboard of the passenger's side of the vehicle.

Q.   What happened next?

A.   At which time I could only see – once he got it to the floor – the handle of the weapon from him moving it from taking it off. I could see like a handle of a weapon. And from there I was trying to notify Crosby without letting him know that I see him. I was really looking at my partner to give him facial gestures like "this guy has a gun." From there he noticed it also. Then from there he went ahead and said, "Let's get the passenger out of the car."

(Tr. at 42-43.) Officer Robinson then observed Tyler put a substance that appeared to be marijuana in his mouth and begin to chew, apparently in an attempt to destroy the drugs. At that point, the officers immediately pulled Tyler out of the vehicle and retrieved the handgun. Tyler then told Parker to "take the pistol

charge."[3]

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Proper Basis For Traffic Stop

#### 1.  Probable Cause of Traffic Violation

Tyler seeks to suppress the firearm seized and statement made
as a result of the traffic stop because, he argues, the officers
did not have a proper basis to initiate the stop.  "In determining
the constitutionality of an investigatory detention under <u>Terry v.
Ohio</u>, we employ a two-part inquiry that asks whether there was a
proper basis for the stop and whether the degree of intrusion was
reasonably related in scope to the circumstances of the stop."
<u>United States v. Guajardo</u>, 388 F. App'x 483, 487 (6th Cir. 2010)
(internal citation omitted) (citing <u>United States v. Caruthers</u>, 458
F.3d 459, 464 (6th Cir. 2006)).  "Although 'virtually every other
circuit court of appeals has held that reasonable suspicion

---

[3]At the suppression hearing, Parker testified that she checked
her rearview mirror and signaled before changing lanes, that the
officers approached the passenger's side of her car and stated to
Tyler, "We got you now A-1," and that the officers pulled Tyler out
of the car and began twisting his broken leg as Tyler screamed in
pain.  As stated above, the court finds Parker's testimony to be
not credible.  Parker has known Tyler for about eighteen years and
has a child with Tyler's cousin.  She testified that she has six
prior convictions for theft and a federal felony conviction for
Possession of Stolen Mail, which the court may consider under the
"relaxed" evidentiary rules applicable to suppression hearings.
<u>See</u> <u>United States v. Reynolds</u>, No. 1:07-cr-98, 2008 WL 320290, at
*5 (E.D. Tenn. Feb. 4, 2008); <u>United States v. Williams</u>, No. 99-
20189, 2000 WL 191759, at *4 (W.D. Tenn. Jan. 31, 2000).  Moreover,
in her testimony before the grand jury, Parker never mentioned that
the officers allegedly assaulted Tyler.

suffices to justify an investigatory stop for a traffic violation,'

this circuit has required probable cause to justify an

investigatory stop for *completed* misdemeanor traffic violations."[4]

Id. (emphasis in original) (quoting United States v. Simpson, 520

F.3d 531, 540 (6th Cir. 2008)). "The requirements of probable

cause are satisfied where the facts and circumstances within their

(the officers') knowledge and of which they had reasonably

trustworthy information (are) sufficient in themselves to warrant

a man of reasonable caution in the belief that an offense has been

or is being committed." United States v. Davis, 430 F.3d 345, 352

(6th Cir. 2005) (internal quotation marks omitted).

Further, "police officers [may] stop vehicles for any

[traffic] infraction, no matter how slight, even if the officer's

real purpose was a hope that narcotics or other contraband would be

found as a result of the stop." United States v. Mesa, 62 F.3d

159, 162 (6th Cir. 1995). "Thus, the officer's subjective intent

for executing the stop is irrelevant." United States v. Torres-

Ramos, 536 F.3d 542, 550 (6th Cir. 2008).

In this case, the court finds that the officers had probable

cause to stop Parker's vehicle because they observed Parker commit

---

[4]However, when the stop is for an *ongoing* violation, no matter
how minor, "reasonable suspicion will be sufficient to justify an
investigatory stop." Id. (citing Simpson, 520 F.3d at 541).

a violation of Tennessee Code Annotated § 55-8-143(a).[5]  Section

55-8-143(a) provides that "[e]very driver who intends to start,

stop, or partly turn from a direct line, shall first see that that

movement can be made in safety, and whenever the operation of any

other vehicle may be affected by such movement, shall give a signal

required in this section, plainly visible to the driver of the

other vehicle of the intention to make such movement."  Id.

Therefore, if an officer observes a vehicle changing lanes under

circumstances that could affect the safety of other vehicles and

the vehicle changed lanes without signaling, the officer has

probable cause that the driver of the vehicle has violated § 55-8-

143(a) and thus may stop the vehicle.  See United States v. Mamoth,

No. 94-6315, 1997 WL 215511, at *3 (6th Cir. Apr. 29, 1997)

(finding that officer had probable cause to believe that defendants

violated § 55-8-143(a) when he observed driver of motor home change

---

[5]The government argues that the officers had probable cause to believe that Parker violated Tenn. Code Ann. § 55-8-123(1).  That statute provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety."  Tenn. Code Ann. § 55-8-123(1).  The Sixth Circuit has held that "[b]oth this court and the Tennessee courts have found no violation of § 55-8-123, and therefore no probable cause [for the police to stop a vehicle], when a vehicle has veered from its lane but is not otherwise driving erratically."  United States v. Gross, 550 F.3d 578, 583-84 (6th Cir. 2008) (citing cases).  The court need not decide whether Parker's lane change maneuver could be considered "erratic" as contemplated by Gross, because the officers observed her change lanes without using her turn signal in violation of Tenn. Code Ann. § 55-8-143(a).

lanes in the vicinity of another vehicle without signaling); State v. Feaster, No. M2009-01284-CCA-R3-CD, 2010 WL 2852284, at *6 (Tenn. Crim. App. July 21, 2010) ("In order to establish a violation of section 55-8-143(a), the evidence must show that a vehicle turned or changed lanes without signaling and that this failure to signal at least threatened to create a hazard involving other vehicles."); State v. Smith, 21 S.W.3d 251, 257 (Tenn. Crim. App. 1999) ("Thus, the only time a driver must signal before changing lanes appears to be when that change will affect other vehicles."). Cf. United States v. Olson, 59 F. Supp. 2d 725, 729 (M.D. Tenn. 1999) (finding that even assuming, *arguendo*, that § 55-8-143 applies to lane changes, the trooper did not have probable cause to stop defendant's vehicle because trooper testified the failure to signal did not cause any hazard to the vehicles traveling behind defendant's vehicle).

As discussed above, the court credits the officers' testimony that Parker's vehicle turned into their lane without signaling, that Officer Crosby had to apply his brakes and swerve to avoid a collision with Parker's vehicle, and that the improper lane change caused the police vehicle to nearly collide with another vehicle. Thus, the officers had probable cause that a traffic violation had occurred, which gave them a proper basis to stop Parker's vehicle.

2.    Reasonable Suspicion

In addition, the officers had reasonable suspicion to stop the

vehicle based on information from Agent Richardson and the CI that Tyler had been involved in a drug transaction with the CI and that Tyler had stolen the buy money. "An investigative stop of a vehicle is permissible under the Fourth Amendment where the stop is supported by reasonable suspicion of wrongdoing." United States v. Flores, 571 F.3d 541, 544 (6th Cir. 2009) (citing Terry v. Ohio, 392 U.S. 1, 22 (1968) and United States v. Williams, 962 F.2d 1218, 1223-24 (6th Cir. 1992)). When considering what constitutes reasonable suspicion, "[c]ourts must determine from the totality of the circumstances whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing." United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2004) (citing United States v. Arvizu, 534 U.S. 266, 273-77 (2002) and United States v. Orsolini, 300 F.3d 724, 728-29 (6th Cir. 2002)). Reasonable suspicion can be based on the officers' own personal observations as well as on the collective knowledge of other officers. United States v. Braggs, 23 F.3d 1047, 1049 (6th Cir. 1994).

The officers received information from Agent Richardson that the CI had engaged in an undercover drug deal with Little Bones (Tyler) and that Tyler had stolen the buy money from the CI. The CI took the officers to the house where Tyler was located and he gave the officers a physical description of Tyler, including the fact that he would be on crutches. When the officers arrived at the house, the officers saw an individual on crutches who matched

-10-

the description provided by the CI, and the CI positively identified that person as Little Bones. Although the CI initially lied about being robbed at gunpoint, the information the CI provided was otherwise accurate and could be reasonably relied upon by the officers. Finally, the degree of intrusion was certainly reasonably related to the situation at hand, as the officers stopped the vehicle and asked limited questions of Parker before seeing the gun.

**B.    Seizure of Firearm**

Once the officers observed the gun in Tyler's coat, they had a basis to seize the weapon. "[A] police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003). Because Officers Crosby and Robinson both observed in plain view a gun protruding from the coat on Tyler's lap, they were justified in seizing the weapon for officer safety. See United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996) (officer's seizure of weapon in "plain view" protruding from driver-side console of car deemed lawful); United States v. Morton, 17 F.3d 911, 913-14 (6th Cir. 1994) (officer's seizure of weapon in "plain view" from defendant's rear pocket deemed lawful).

**C.    Tyler's Statement**

Tyler also seeks to suppress his statement to Parker to "take the pistol charge." "'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by <u>Miranda</u>." <u>United States v. Bailey</u>, No. 08-2577, 2011 WL 71462, at *2 (6th Cir. Jan. 10, 2011) (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)); <u>see also</u> <u>United States v. Murphy</u>, 107 F.3d 1199, 1204-05 (6th Cir. 1997) (statements voluntarily made by defendant in custody in police car deemed admissible even though <u>Miranda</u> warnings not given); <u>United States v. Montano</u>, 613 F.2d 147, 149 (6th Cir. 1980) (defendant's voluntary statements made without pressure or questioning deemed admissible even though <u>Miranda</u> warnings not given). Tyler's statement was made voluntarily and not in response to any police questioning, and thus the protections of <u>Miranda</u> do not apply.

### III.  RECOMMENDATION

For the reasons above, it is recommended that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

January 13, 2011
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.**

28 U.S.C. § 636(b)(1)(c).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.